## GULF BITULITHIC CO. v. NUECES COUNTY. (No. 910-4981.)

Commission of Appeals of Texas, Section B. Dec. 12, 1928.

Vinson, Elkins, Sweeton & Weems, of Houston, Kleberg & North, of Corpus Christi, and Robert W. Stayton, of Austin, for plaintiff in error.

Gordon Boone and Russell Savage, both of Corpus Christi, for defendant in error.

LEDDY, J. We adopt the statement of the case made by the Court of Civil Appeals (297 S. W. 747), which is as follows:

"At a county-wide election held in Nueces county on July 26, 1919, the commissioners' court of that county was authorized to issue bonds in the sum of $2,000,000 for the purpose of constructing, maintaining, and operating macadamized, gravel, or paved roads, etc., in the county. In pursuance of this authority the commissioners, on August 11 thereafter, issued said bonds in three series, the first of which (A) was in the sum of $100,000 appropriated to the retirement of bonds previously issued by one of the subdivisions of the county, and not involved in this litigation; the second series (B), aggregating in amount the sum of one million dollars, and the third (C), nine hundred thousand dollars. None of the bonds were sold at the time of issuance.

"On September 14, in the same year a disastrous hurricane swept the county, and particularly the city of Corpus Christi, resulting in great loss of property and consequent depressed business conditions. The commissioners' court took prompt cognizance of these conditions and sought to use their power to alleviate them. They decided to postpone, indefinitely, the sale of series C of the bonds, in order to reduce the necessary tax levy, which was done, and to sell only series B at that time. As a further step toward alleviation the commissioners also decided not to construct the proposed system of roads by letting the contract therefor upon competitive bids to outsiders, but to themselves construct them in order to give employment to local residents. They were also moved to this

course by the high and still rising cost of materials prevailing at that time; they believed they could do the work cheaper than they could get it done by contract.

"Some years prior to this time the city of Corpus Christi had engaged in a comprehensive program of street paving, under contracts with the Texas Bitulithic Company, a subsidiary of Warner Bitulithic Company and the parent of the Gulf Bitulithic Company, appellant herein. It appears impressively in the record that this work done on the streets of Corpus Christi greatly pleased those in authority in that city and in Nueces county. The paving laid by that company years before the storm survived, unscathed, the ravages not only of the intervening years, but of the hurricane as well. These evidences of the strength and durability of this paving seems to have been greatly impressed upon the members of the commissioners' court who were serving in 1919 and, together with their acquaintance with and confidence in the officials of the paving company, now officials of the Gulf Bitulithic Company, largely influenced them in entering into the contract now in controversy.

"So, when the commissioners' court set about to consider the important matter of constructing a system of roads out of the money voted by the people, they put in mind the excellence of the street paving in Corpus Christi, and apparently sought to visualize a system of county roads of the same material. Having great confidence in the officials of the company which paved the streets of Corpus Christi, but who had in the meantime become the officials of appellant, Gulf Bitulithic Company, the commissioners consulted those officials very freely and fully as to the wisest course to pursue in the project before them. The cost of road materials and supplies, and freight charges thereon, was very high at that time and was still rising. It was considered that road contracting companies could not afford to and would not submit bids for road contracts except upon the basis of existing high prices of materials and supplies, with additional latitude for possible increases in those prices; that if the county let the work upon such contracts it could not avail itself of any reduction of prices likely to occur during the progress of the work; that if the commissioners themselves undertook the work they could avoid the inflation of existing prices upon which contractors would base their bids, and could also get the full benefits of any reduction in prices occurring during the progress of the work, which would run through a period of many months. In other words, it was decided by the commissioners, influenced largely by the counsel of the officials of the Gulf Bitulithic Company, that by doing the work themselves they could realize more for the county out of the bond money than they could get by letting the work by contract upon competitive bids.

"The question, also, of state and federal aid was considered. It was understood that if the work should be done by contract certain substantial aid, to wit, about $200,000, would be given the county by those authorities, but the commissioners, upon consideration, concluded that the benefits derivable from that aid would be more than offset by the restrictive interference of those authorities. So the decision was reached that the road program be carried out by the county doing its own work at direct expense, without the intervention of construction contracts.

"It is obvious from the record that the commissioners were further influenced to the course stated by the assurance that they could get the supervisory services of the Gulf Bitulithic organization in constructing the proposed road system. As stated, the managing officials of that company were managing officials of the Texas Bitulithic Company when the Corpus Christi streets were paved, and the members of the commissioners' court knew them and had full confidence in their integrity and their skill as street and road makers. They fully consulted those officials with reference to the proposed road building program, and were assured of the friendly co-operation of those officials. As a result of numerous conferences, the commissioners' court entered into a contract with the Bitulithic Company, which contract was embraced in the following resolution passed by the commissioners' court (formal parts omitted):

"'Whereas, in the judgment of the commissioners' court of Nueces county, Tex., it is expedient and to the best interest of the county and the taxpayers thereof that the roads and highways of this county, to be built and constructed out of and with the proceeds of the Nueces county special road bonds heretofore authorized by vote of the taxpaying voters on July 26, 1919, be built and constructed by the commissioners' court and under the direct supervision and control of the court, and not by general contract, and that such plan of construction will result in better and more permanent roads at a material saving in cost to the county:

"'Therefore, it is ordered by the commissioners' court of Nueces county that the system of roads and highways, provided for by said Nueces county road bonds, issued the 11th day of August, 1919, be constructed by the county under the supervision of the commissioners' court, and that the said court employ the Gulf Bitulithic Company as its agent and representative to supervise and manage the construction of the said roads, subject to the following contract:

"'The State of Texas, County of Nueces:

"'Know all men by these presents, that this agreement, entered into by and between the County of Nueces, acting by and through its commissioners' court, hereinafter called the county, and the Gulf Bitulithic Company, acting by and through its President, James H.

Pittman, hereinafter called the company, witnesseth—

" 'That in consideration of the premises and the services to be rendered by the company, as hereinafter provided, the county does hereby employ the Gulf Bitulithic Company as its agent and representative to organize, assemble, and operate the necessary organization to manage and supervise the complete building and construction of all the roads and highways embraced in the present proposed Nueces county road system, and to procure, assemble, and operate for, and at the expense of, said county all of the necessary organization, labor, machinery, tools, teams, equipment, facilities, supplies, and foremen, and to do any and all things necessary and proper to enable the county to build and construct said roads in accordance with the plans, specifications, and drawings furnished by the county highway engineer, subject, however, to the supervision, direction, and instructions of the commissioners' court of said county. All of which said organizations, labor, material, freight, machinery, tools, teams, equipment, facilities, and supplies shall be paid for by the county under such terms and conditions as it may authorize and direct. In the organization, selection, and acquisition of same, and in the disposition and sale of unnecessary machinery and equipment the company shall render to the county its best advice, assistance, and aid in securing for the county the best and most advantageous price, terms, and conditions.

" 'The county shall also pay the cost of all deposits, rentals, employers' liability insurance, bonds, insurance premiums, royalties, office expenses, transportation charges, and all other expenses and charges which may be incurred and incident to the building of said roads under this agreement: Provided, however, any and all expenditures under this agreement shall be subject to the approval of the commissioners' court, or some duly authorized officer thereof.

" 'The company shall begin the said work herein specified at the earliest time practicable, and diligently proceed under direction of said commissioners' court so that such work may be carried on with dispatch and completed as soon as practicable. The company shall keep a superintendent on the work at all times until completed.

" 'In consideration hereof, and of the services rendered and to be rendered by the Gulf Bitulithic Company, Nueces county hereby obligates and binds itself to pay to the Gulf Bitulithic Company a sum of money equal to 6 per cent. of the total cost incident to the construction of said roads.

" 'Payment thereof to the Gulf Bitulithic Company by Nueces county shall be made on or before the 10th day of each month hereafter, and shall be based upon all expenditures in connection with said work which have been actually paid by said county up to and including the last day of the preceeding month: Provided, however, in determining the said amount due said company, the amount paid by the county for engineering services, the amount received by the county from the sale of any equipment, and amounts paid to the company as compensation shall not be taken into consideration.

" 'An itemized statement of all such expenditures shall be furnished the company by the county each month.

" 'It is understood and agreed that no salary shall be paid by the county to any officer of the company, nor to the general superintendent of construction.

" 'This contract shall not become effective and binding until the sale of the bonds herein referred to has been consummated and sufficient portion of the proceeds thereof placed in the county treasury to begin operations.

" 'For the faithful performance of all the terms of this contract the parties hereto bind themselves on this the 12th day of November, A. D. 1919.'

"In the language of a finding by the trial court: 'This contract was awarded to Gulf Bitulithic Company without advertisement or competitive bidding, and the commissioners' court did not require, and the Gulf Bitulithic Company did not execute or deliver to the county a bond or any other security for the performance of said contract.'

"Under the contract the commissioners' court proceeded with the construction of the planned system of roads until the funds derived from the sale of series B of said bonds were exhausted. This activity covered the period from March 27, 1920, to the month of May, 1922, when the commissioners' court completed the payment to the company of the amount earned by it up to that time, under the provisions of the contract, through the expenditure of the amount derived from the sale of series B of the bonds, and notified the company that 'its services would no longer be required.' The company protested against its discharge, refused to accept dismissal, and advised the commissioners that it was at all times ready, able, and willing to perform its obligations under the contract, as the evidence and the court's findings showed it to be. The commissioners, however, notified the company that it would not be permitted to further participate in the road-building program, and it did not do so. The amount paid the company for its services in the matter was $50,287.45, or, as provided in the contract, 6 per cent. of the amount expended, less certain deductions stipulated in that instrument. Out of this amount the company paid the salary of its local superintendent on the work, as well as the expenses incurred by its officials in connection with the project, the whole amounting to $9,629.81; otherwise it had no expense in the matter.

"Subsequently, the commissioners' court sold the remaining series of bonds, aggregat-

ing $900,000, advertised for bids upon the remaining work to be done, let the contract to the lowest bidder, of whom the statutory bond was exacted, and otherwise complied with the appropriate statutes. After the work was completed under this contract, and after all the funds derived from the sale of the several series of bonds had been expended, the Gulf Bitulithic Company brought this action against Nueces county for damages for breach of contract, which damages were placed at the net amount the company would have realized had it been permitted to complete performance of the contract by continuing its services through the expenditure of the proceeds of series C of said bonds. The amount was alleged to be $52,500, or 6 per cent. of $900,000, less certain stipulated deductions. The county answered, setting up that the contract was illegal and void, and by way of cross-action sought to recover the amount it had paid the company under that contract. The court rendered judgment against the company upon the ground that the contract was void, and against the county on its cross-action upon the ground that it was barred by limitation. The company appealed, and the county filed and here urges cross-assignments of error."

The Court of Civil Appeals affirmed the judgment denying recovery to plaintiff in error, but reversed and rendered the judgment denying recovery to the county upon its cross-action.

■ It is first insisted that the contract in question is void because awarded by the commissioners' court without advertisement and competitive bids, and without the execution of a bond by plaintiff in error. This insistence involves the proper construction of article 2268a (Complete Tex. Stat. 1920), the pertinent provisions of which read:

"The commissioners' court * * * shall make no contract calling for or requiring the expenditure * * * of * * * $2,000 or more * * * without first submitting such proposed contract to competitive bids; notice of the time * * * when * * * such contract [shall] be let, shall be published: * * * Provided, that in case of public calamity, * * * this provision may be waived: * * * Provided, that the provisions of this act shall not apply to any work done under direct supervision of the county commissioners and paid for by the day."

The clear purpose of the enactment of this statute was to enable counties to obtain the performance of any public work at the lowest possible cost to the taxpayer. If it be so construed as to bring contracts of the nature involved in this case within its provisions, the very object of the statute would be defeated, for the obvious reason that, when a county does a given piece of construction work, paying for the material and labor, the ultimate cost thereof is necessarily largely dependent upon the skill, experience, and business judg-

ment exercised in the management and supervision of such work.

Where a county does the building of its public roads by contract, it is not particularly interested in whether the contractor constructs such road in an economical manner. If he fails to do so, and a loss results, the same does not fall upon the county, as it can only be required to pay the price stipulated in the contract, and such loss must be borne by the contractor. Where, however, the county has the work performed under its own supervision, paying cost of the labor and material, it is vitally interested in such work being done in the most economical manner possible, as it must bear the entire cost thereof, whatever it may be. To hold that contracts for the supervision of work done directly by the county must be let to the lowest bidder would result in the county obtaining the least competent supervision, as those possessing the necessary skill, experience, and business judgment to supervise a large construction program in the most efficient and economical manner could not hope to successfully compete with those of lesser skill, experience, or business judgment.

It cannot be gainsaid that the efficient performance in the most economical manner of the duties undertaken by plaintiff in error under the contract in question required technical knowledge, skill, experience, and business judgment of a high degree. The sad experience of many commissioners' courts throughout the state in constructing public roads without intelligent and experienced supervision bears eloquent testimony to the truth of this proposition.

Each member of the commissioners' court testified, without dispute, that the county planned to build roads like the streets of Corpus Christi, of bitulithic pavement. This was a patented pavement, that could not be used without the consent of the company with whom it contracted. They also testified that this organization of men was employed to supervise this work because of their experience, scientific and professional knowledge, and skill in constructing durable and permanent roads. The company was not employed as contractor or materialman, but as an agent, to give the county the benefit of its advice and experience as practical road builders, and to manage and supervise the county's building of its own roads. Under such a contract, the county was to receive the benefit of the skill, knowledge, and experience acquired by this road-building organization through a long period of years. This supposed benefit undoubtedly induced the execution of the contract.

Our courts have repeatedly recognized that contracts of the nature involved in this case, involving special skill and experience, were not within the contemplation of the statute as to competitive bids. In the case of City of Houston v. Potter, 41 Tex. Civ. App. 381, 91

S. W. 389, it appeared that the charter of the city of Houston provided: "That all works of improvements and public works for said city of Houston, the cost of which shall exceed the sum of $500, shall be let out by sealed bids to the lowest bidder." It further appeared that the city in that case let the contract to appellee without advertising for bids. By the terms of the contract it agreed to pay him 5 per cent. of the cost of the construction of a sanitary sewer system that was to be installed at a cost of $300,000. The court, in disposing of the contention that the charter provisions applied to such contract, said: "This was not intended to refer to a contract *for the supervision of a work of public improvement.* From the nature of such work it is clear that it would be impracticable to let out a contract for it on sealed bids." The denial by the Supreme Court of a writ of error necessarily approved this holding, which we regard as decisive of the question under consideration.

Again, in Hunter v. Whiteaker (Tex. Civ. App.) 230 S. W. 1096, in which writ of error was refused, it was shown that civil engineers were employed, without competitive bids, to supervise and lay out the work of building roads in Johnson county. The contention was there made that such contracts were void under article 2268a, but it was denied, for the reason, among others, "because the intention of such law could not have been to include contracts like that in suit on account of the absurdity of such a construction." The court aptly observes that, if competitive bids were to be the test for this character of employment, "such a test would probably be the best that could be conceived for obtaining the services of the least competent man, and would be most disastrous to the material interest of a county." To the same effect are the following cases: Douglass v. Myrick (Tex. Civ. App.) 159 S. W. 422; Gibson v. Davis (Tex. Civ. App.) 236 S. W. 202; Tackett v. Middleton (Tex. Com. App.) 280 S. W. 289, 44 A. L. R. 1143; Wallace v. Commissioners' Court (Tex. Civ. App.) 281 S. W. 593; Roper v. Hall (Tex. Civ. App.) 280 S. W. 289; City of Houston v. Glover, 40 Tex. Civ. App. 177, 89 S. W. 426.

It would be ludicrous indeed if a county should publish to the world that it desired to let to the lowest bidder a contract to supervise the building of an elaborate road system, involving the expenditure of $2,000,000. Under such an advertisement, it might be compelled to place the supervision of this immense construction program and disbursement of this vast sum of money under one of its local road overseers. In the very nature of things, the Legislature, in passing this statute, did not contemplate that services of the kind covered by the contract in question should be subject to competitive bids, but evidently intended that, when personal services, demanding special skill, experience and business judgment, were required, the commissioners' court might adopt such method in securing such services that would be reasonably calculated to obtain the particular type of services desired.

It is further insisted that, under Complete Stat. 1920, articles 6394f–6394j (now R. S. arts. 5160–5164), a bond is required where the contract is for the "construction of any public building or the prosecution and completion of any public work" by a person or persons, which shall contain an obligation in behalf of all persons supplying him or them with labor and material in the prosecution of the work provided for in such contract. Under this statute, the laborers and materialmen are given a cause of action on the bond for supplying "him"—that is, the contractor—with labor and material in the prosecution of the work.

Evidently, this statute was not intended to apply to a contract to supervise the construction of public roads, as by its express terms it appears to be applicable only to construction contracts where the contractor is supplied with labor and material. Under the contract involved, plaintiff in error, as supervisor of this construction work, was not in any way responsible for the payment or the furnishing of the labor or material in the building of said roads, nor was any such labor or material furnished to him. If a bond was required under this contract, the supervisor would be principal thereon, and thus be obligated to pay for all labor and material for which it had assumed no obligation whatever. It has been determined that this statute was enacted "in order to protect those who labor on public works or furnish materials *to the contractors*, who in many instances were left unpaid." Trinity, etc., Co. v. Lion, etc., Co. (Tex. Com. App.) 229 S. W. 485. We conclude the statute has no application to a contract of the nature involved herein.

It is next insisted that the contract is invalid, because the compensation provided therein is so grossly excessive, unreasonable, and unconscionable as to constitute and amount to legal fraud upon the county. There is no evidence in the record to justify the conclusion that the compensation provided in the contract is grossly excessive. On the contrary, the undisputed evidence showed it was not excessive.

A party seeking to avoid a contract, on the ground that the compensation for personal services is so grossly excessive as to amount to legal fraud, must assume the burden of proving such fact. Corpus Christi, etc., Co. v. Baxter (Tex. Civ. App.) 217 S. W. 187; Quannah, etc., R. Co. v. Price (Tex. Civ. App.) 192 S. W. 805; Hammond v. Atlee, 15 Tex. Civ. App. 267, 39 S. W. 600; Rule v.

Richards (Tex. Civ. App.) 149 S. W. 1073; Baldwin v. Drew (Tex. Civ. App.) 180 S. W. 614.

In Rule v. Richards, supra, the objection was made to the admission in evidence of the sheriff's deed to certain town lots in Paducah, Tex. It was claimed that such deed was void for gross inadequacy of consideration. The court denied the contention, stating: "This court cannot judicially know, in the absence of such claim and proof, that the sum realized, to wit, $50, was such grossly inadequate consideration for the 120 lots as would warrant our holding said deed void upon collateral attack."

The same conclusion was reached in Baldwin v. Drew, cited above, in which the court held that it would not be authorized in taking judicial notice that $500, recited in a deed as the purchase price for 1,579 acres of land, was an inadequate price.

█ In determining whether the compensation provided in the contract is so grossly excessive as to shock the conscience of the court, we must consider the circumstances under which the contract was executed. It was shown that the tropical hurricane which swept the Texas coast in 1919 did tremendous damage, particularly to the downtown portion, of the county seat of Nueces county. It appeared that the Texas Bitulithic Company had laid its special patented pavement at that place, and that it had withstood a force of wind, water, and débris which ruined a large number of other pavements. The commissioners' court was aware of this fact, and had the utmost confidence in said company as a successful builder of pavements. Mr. Pittman, the president of the newly organized Gulf Bitulithic Company, had been for many years connected with the parent concern. They knew that, and for this reason were anxious to obtain the services of his company. He explained to the commissioners' court that the organization consisted of Warren Bros. Company, one of the largest street-paving concerns in the world, with more than 50 years' experience in constructing paved streets and roads all over the world. It also consisted of the Texas Bitulithic Company, the one that the commissioners' court knew had done such satisfactory work in paving the streets of Corpus Christi. The court, with full knowledge of all these facts, determined to build roads like the streets of Corpus Christi—that is, to use bitulithic surfacing—and, after a full and careful investigation, decided to employ the Gulf Bitulithic Company to supervise and manage the entire work. This particular pavement was a patented process, and the Gulf Bitulithic Company was licensed to use the patent in that territory.

The court further reached the conclusion, after due deliberation and investigation, that, if competitive bids were asked for to build these roads, such bidders would necessarily fix the amount of their bids on the then high price of material and labor. The performance of the contract was one that would necessarily run through a period of several years, and, as the cost of material and labor were not only high at that time, but still rising, such prices would naturally be reflected in the bids which the court would receive to do such work. It was concluded that, if the county did the work itself, it might receive the benefit of any decline in prices that might occur. It was therefore decided, after the most mature consideration, that the county would do the work under the immediate supervision and management of the Gulf Bitulithic Company.

The contract on the part of plaintiff in error involved the supervision and management of the expenditure of approximately $2,000,000. For a fee of 6 per cent. of the cost, less engineering expenses and commissions, plaintiff in error contracted to assemble, systematize, and operate the necessary organization, to manage and supervise the construction of the whole project, to procure, assemble, and operate all of the labor, material, machinery, tools, teams, equipment, facilities, supplies, foremen, and organization, including the making of records, and the giving of advice necessary to construct such roads in the most efficient manner according to the engineer's plans. The company was also to assist in the disposal of machinery after the county had finished using the same. It was required to keep a superintendent constantly on the job at its own expense. It subsequently developed that this contract would require three or four years for its completion, as two years were actually spent by plaintiff in error before it was notified its services were no longer required in supervising the work with its superintendent constantly on the job, and its expert engineer and officers in frequent consultation with the commissioners' court in an effort to give the county the benefit of the experience and business judgment of plaintiff in error and its parent companies.

There can be no doubt that the services to be rendered by the company under this contract were contemplated to be of the highest type. The commissioners' court believed it was employing an organization to manage and supervise the building of its road system whose reputation as road builder was not surpassed in the state. It had the advantage of the assistance and advice of the most capable and experienced engineering talent of Warren Bros. organization, the Texas Bitulithic Company, and plaintiff in error's own organization. The county was to receive the benefit of the advisory services of these organizations, which were admitted to be among the best in the country. During the progress of this contract, it is shown that the county did in fact receive the advice or the experienced officials of these organiza-

tions, including one of their most capable engineers. It was also shown that the actual cost to plaintiff in error in furnishing its services for supervising the entire work would have amounted to practically one-fourth of the total compensation it was to receive under the contract.

It is difficult to conceive upon what theory a court is authorized to declare the compensation provided in this contract to be so grossly excessive as to amount to legal fraud against the county, when there is no evidence in the record tending to show that it is in any way excessive. The only evidence offered was that of Mr. Pittman, who testified that the services provided for in the contract were worth more than the compensation agreed upon. Upon the trial, a large number of witnesses were interrogated, including nine civil and construction engineers, two of whom were called by the county, and six contractors, one of whom testified in behalf of the county, and it was not even sought to prove by either of these witnesses that such compensation was in the least excessive. It seems to us that, if the compensation provided for in the contract is so grossly excessive as to shock the conscience of the court, it would have been an easy matter for the county to have offered some evidence as to its excessive character. The county seems to have vigorously urged every defense possible to prevent a recovery of the compensation it agreed to pay plaintiff in error, and, if it deemed such compensation so grossly excessive as to amount to legal fraud, it should not have permitted Mr. Pittman's testimony that the compensation was extremely reasonable to go into the record without being challenged.

It seems that the court predicated its conclusion that the compensation was grossly excessive on the amount of cash expended by plaintiff in error in performing its duties under the contract. It was shown that the company expended something over $9,000 in carrying out the contract up to the time it was notified its services would no longer be required. It appears, however, that the unfinished portion of plaintiff in error's work under the contract was the most expensive part thereof, and that it would have been necessary for it to have expended over $20,000 to have completed the contract.

The reasonableness of the compensation in a contract of this nature cannot be measured by the amount of cash expended, as the principal consideration for the services to be performed under the contract, so far as the county was concerned, was the obtaining of the skill, knowledge, experience, and business judgment of the company it had employed to supervise the work, and, if it obtained the benefit of these things in the building of its roads, it is wholly immaterial that little cash was expended by the company in giving the county the benefit of such supervision. Gen.

Goethals may have expended little money personally in his work in supervising the construction of the Panama Canal, but the technical skill, knowledge, and experience he put into the services rendered were invaluable to the government in the completion of that great project. The value of his supervision of that work could not fairly be measured by the amount of expense incurred by him in rendering such services. The county in this case was seeking to purchase the best skill and knowledge it could obtain in supervising the expenditure of $2,000,000 in the building of its public roads. Its efforts to obtain such skillful supervision is more to be commended than its endeavor to defeat the compensation it solemnly agreed to pay therefor.

■ Inasmuch as this contract calling for the performance of services requiring special knowledge, experience, and business ability in the management of a building project of the kind involved, there is no basis for the holding that the compensation provided therein is grossly excessive as a matter of law. The evidence of a witness, not disputed, who had long years of experience in this particular work, shows that it is extremely reasonable. Under such state of the record, for a court to determine that the compensation is grossly excessive can only be the result of the purest kind of guesswork. If we were to hazard a guess as to the value of services of the character described in the contract, we would say that the stipulated compensation is not upon its face grossly excessive. However, before solemn contracts are set aside and parties who have performed services thereunder are denied payment therefor on the ground that the stipulated compensation is grossly excessive, the record should contain positive testimony to that effect. This is especially true in the absence of any evidence whatever that fraud or overreaching was practiced to induce the execution of the contract. The contract was shown to have been entered into after the most deliberate and mature consideration upon the part of the commissioners' court.

■ It is next insisted that, because the personnel of the court changed about one year after the contract was made, it was not binding upon the subsequent commissioners' court. It appears that two new members of the court were elected at that time, leaving a majority of the old court. The new court permitted the contract to continue for about a year before taking any action to terminate the same.

■ It is urged that the old court could not make a contract of this character that would be binding upon their successors. Ordinarily, contracts made by a commissioners' court, or a similar body, cannot be repudiated merely because the personnel of the body has subsequently changed. Manley v. Scott, 108 Minn. 142, 121 N. W. 628, 29 L. R. A. (N. S.) 652; Webb v. Spokane County, 9 Wash. 103,

37 P. 282; Board of Commissioners v. Shields, 130 Ind. 6, 29 N. E. 385; Town of Pearsall v. Wools (Tex. Civ. App.) 50 S. W. 959; Withers v. City of New York, 92 App. Div. 147, 86 N. Y. S. 1105; Pickett Pub. Co. v. Board, 36 Mont. 188, 92 P. 524, 13 L. R. A. (N. S.) 1115, 122 Am. St. Rep. 352, 12 Ann. Cas. 986.

The commissioners' court of Nueces county, under the power vested in it by law, had the right to build and construct its public roads without letting a contract therefor, if it saw fit to do so. The power to build such roads necessarily implied the additional power to employ such agents as might be reasonably necessary to accomplish such purpose. In fact, there is express statutory authority for the employment of such agents. Article 1580, R. S. 1925. If it had the power to employ plaintiff in error to supervise the building of its roads, which cannot be seriously questioned, it necessarily follows that it could employ it for such length of time as was reasonably necessary to complete such work. The building of the roads contemplated was planned and designated as one unit, and, if the county was authorized to do this particular work itself, it had the legal right to employ such agents as it deemed necessary, not only to carry on, but to complete the work as originally planned.

It is only where the employment by a commissioners' court is personal and confidential, as in the case of an attorney, that it is held that one commissioners' court cannot bind its successors. We think the correct rule is announced in the Withers Case, supra, where the Court of Appeals of New York said: "The employment was one having a specific object, and would necessarily terminate upon the completion of the buildings which were to be erected under the authority of the statute. There is no reason why a contract of employment in reference to this specific work until its completion should not be entered into, any more than any other contract in connection with any public building, the erection of which is liable to extend beyond the term of office of the individual members of the board authorized to make the contract."

To hold that contracts essential to the performance of public works are subject to be repudiated, if there is a subsequent change in the personnel of the court awarding same, would seriously hamper such court in the discharge of its duty to the public. Under such a rule, it would be difficult for the court to obtain suitable agents to carry on a given piece of public work, if, at the time such contract was made, it was known that its continuation depended upon the result of an impending election for members of the commissioners' court. Contracts made under these circumstances would be so uncertain in duration that it would be difficult for the county to obtain efficient services.

Lastly, it is insisted that the Court of Civil Appeals erroneously held that, by making the contract in question, which was exclusive in nature, "the commissioners' court tied its own official hands, and bargained away the county's legislative and governmental powers, whereby it was disabled from performing its duty to the public. The county had the primary power, exercisable at any time, to have all or any part of its road system done under contracts expressly authorized by statute, and it had no authority to enter into any exclusive contract whereby that power and the right to exercise it was abridged or ceded away. The contract, having that effect, was invalid as a matter of law, and was therefore unenforceable."

In this connection the Court of Civil Appeals recites the fact that $600,000 state aid would not have been procurable, if the contract in question had been carried out. As a matter of fact, prior to the time the contract was entered into, the members of the commissioners' court sought state aid and were advised that $200,000 of state funds would be allotted if the county constructed its roads by contract. The state highway commission was informed by these officials that they "should keep their money, and we would build our own roads. * * * We told them that, if that was all they could give on a project as large as this, we considered their interference would amount to more than that, something to that effect, and we would just come back and the county would do the work itself." It appears that the commissioners' court, after a most careful consideration of the matter, and upon the advice of their own engineer, decided that the county could save money and obtain a better system of roads by doing the work itself, with the supervisory aid of plaintiff in error, and for this reason entered into the contract in question.

It is conceded by the Court of Civil Appeals that under the law the commissioners' court had the option of expending the bond money in the construction of improved roads by doing the work themselves, or by having the work done by others under a contract awarded upon competitive bids. This being true, we fail to see how a contract designed to accomplish a thing which the county had the authority to do barters away its governmental power. It seems it is more properly the exercise of its delegated power in this respect. There is no inhibition in the law against a county making an exclusive contract for the supervision of the construction of certain designated roads.

Neither are we impressed with the force of the reasoning leading to the conclusion that the contract was void because it deprived the county of obtaining state aid. A complete answer to such contention is that whether state aid is furnished to a given county is optional with the highway commis-

sion, and it is likewise optional with the county as to whether it desires to accept such aid. As the commissioners' court of Nueces county concluded, at the time this contract was made, that it could. obtain better roads for less money by constructing them under its own supervision than it could by letting a contract, with the amount of the state aid offered, we see no valid reason why it could not, as it did, refuse such aid, and proceed to lawfully enter into contracts for the building of its roads under its own supervision.

It appears that, after plaintiff in error had supervised the construction of the building of defendant in error's roads for a period of two years, the state highway commission, after inspecting the work done under plaintiff in error's supervision and finding it entirely satisfactory, agreed that, if the remainder of the work was done by contract, it would raise its former offer of state aid from the sum of $200,000 to $600,000. It seems that the county desired to avail itself of the privilege of obtaining this state aid, and therefore notified plaintiff in error that its services were no longer needed. It is undisputed that the Gulf Bitulithic Company was ready, willing, and able to continue to perform, and did insist upon its right to so perform, and complete the contract made with the county. It was, however, denied the privilege of doing so, and the remainder of the work was let by contract to Smith Bros., and the county received the advantage of the $600,000 state aid on its roads. The county undoubtedly had the power to breach this contract for the purpose of taking advantage of the large amount of state aid offered by the highway commission, but it did not have the right to do so without becoming liable to plaintiff in error for the compensation provided in the contract.

Under the undisputed evidence, we conclude that the contract was a valid one, that it was wrongfully breached by the county, and plaintiff in error is entitled to judgment against it for the sum of $27,598.38, being the amount which the trial court found plaintiff in error would have earned, had it been permitted to perform its contract to completion, with legal interest thereon from the date of the breach of such contract, and that defendant in error is not entitled to recover on its cross-action.

We therefore recommend that the judgment of the trial court and the Court of Civil Appeals be reversed, and that judgment be rendered in favor of plaintiff in error against defendant in error for the sum of $27,598.38, with 6 per cent. interest thereon from October 30, 1922, and that defendant in error take nothing on its cross-action against plaintiff in error.

GREENWOOD and PIERSON, JJ. Judgments of the Court of Civil Appeals and district court both reversed, and judgment rendered for the plaintiff in error, as recommended by the Commission of Appeals.